Michael L. WILLIAMS, Wonder
B. Henry, Jr., and Carey
Ford, Plaintiffs,

v.

MEAD COATED BOARD,
INC., Defendant.

Civ. A. No. 92–D–7–E.

United States District Court,
M.D. Alabama, E.D.

Oct. 21, 1993.

Gary Eugene Atchison, Julian L. McPhillips, Jr., Montgomery, AL, for plaintiffs.

Sue Ann Willis, J. Frederic Ingram, Birmingham, AL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DE MENT, District Judge.

Plaintiffs, Michael L. Williams, Wonder B. Henry, Jr., and Carey Ford, brought this action against Mead Coated Board, Inc., pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs asserted claims under both the *disparate impact* theory and the *disparate treatment* theory.

The trial of this action began on May 12, 1993. Plaintiffs rested their case on May 19, 1993. Defendant, Mead Coated Board, Inc. ("defendant" or "Mead"), then filed a motion for judgment pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, seeking judgment on all of plaintiffs' claims asserted in the action. The court has received and carefully reviewed extensive briefs from both the plaintiffs and defendant. Based on the findings of fact and conclusions of law set forth below, the court hereby grants defendant's Rule 52(c) motion for judgment.

## FINDINGS OF FACT

The Court makes the following findings of fact and credibility determinations in accordance with Rule 52(c) of the Federal Rules of Civil Procedure. *See generally Cherrey v. Thompson Steel Co., Inc.,* 805 F.Supp. 1257, 1261 (D.Md.1992) noting that under Rule 52(c), "the judge, as the trier of the facts, must weigh and consider all the evidence presented").

### A. *Mead's Mahrt Mill And Its Expansion.*

1. Defendant, Mead Coated Board, Inc., manufactures coated paperboard which is used to construct soft drink cartons and other similar packages. Defendant operates a paper mill, known as the Mahrt Mill, near Cottonton, Alabama. Plaintiffs, Michael L. Williams, Wonder B. Henry, Jr., and Carey Ford are hourly employees of defendant at defendant's Mahrt Mill.

2. Mead began plans for a major expansion of its Mahrt Mill in 1988, planning to add a second paper machine at the Mill. A paper machine is actually a series of "machines" or assembly line operation which produces coated paperboard. The production of coated paperboard begins at the "wet end" of the paper machine and proceeds to the "dry end" of the machine. Defendant's original paper machine (the # 1 paper machine) is approximately 679 feet long. The machine added (the # 2 paper machine) is 970 feet long. The # 2 paper machine began operations on September 6, 1990. A total of thirteen (13) hourly employees work at each machine on each shift and there are three eight-hour shifts per day, seven days a week, and a rotating or "fourth shift" at Mead's

Mahrt Mill. A total of 52 employees, over this four-shift operation, work on each machine.

3. Defendant's hourly employees who work on the paper machine lines, including the plaintiffs, are members of the same bargaining unit and are represented by the United Paperworkers International Union, AFL–CIO ("the Union"). Defendant's seniority system is a "line of progression" seniority system. Article 12.B of the collective bargaining agreement between Mead and the Union dated November 1, 1986 governs promotions at Mead. Article 12.B has remained virtually unchanged since Mead and the Union entered into their first collective bargaining agreement in 1966.

4. The "line of progression" involved in this case was the same for all promotional sequences. The line consists of 13 job classifications. These job classifications, from the highest-paying job to the lowest-paying job, are: (1) Wet–End Crew Leader; (2) Wet–End First Helper; (3) Dry–End Crew Leader; (4) Dry–End First Helper; (5) Dry–End Second Helper; (6) Dry–End Third Helper; (7) Dry–End Fourth Helper; (8) Dry–End Fifth Helper; (9) Wet–End Second Helper; (10) Dry–End Sixth Helper; (11) Dry–End Seventh Helper; (12) Dry–End Eighth Helper; and (13) Utility. There are eight employees in each job classification.

5. Mead realized in 1988 that the addition of a second paper machine would require Mead to hire additional employees. Mead came to this realization because the number of then present incumbent employees, a number of whom would receive training to move into some of the skilled positions, was insufficient to fill all the skilled positions on the two paper machines. Accordingly, Mead advertised these jobs in trade journals and in newspapers in towns having paper mills. Most of the new hires began to arrive during the fall and winter of 1989, with the remaining few arriving in early 1990.[1]

B. *Seniority, Qualifications And Promotions.*

6. The employment of these additional skilled workers placed the Paper Machine Department supervision, headed by D.D. Smith, the Paper Machine Manager, in a difficult situation or, as the Court noted, presented management with the decision of making a "Hobson's Choice."[2] Since job seniority was the prevalent measure of seniority for promotional purposes at the Mahrt Mill, if the new hires were placed at the bottom of the job seniority roster, and, therefore, behind all of the incumbent employees, it would have been virtually impossible to entice these individuals to accept employment with Mead. This is true because their position on the job seniority roster would severely limit their promotional opportunities.

On the other hand, since many of the new hires would report at various times during 1989 and assigned to the job for which they were hired before any of the incumbent employees could move to positions in the expanded paper mill line of progression, many, if not most, of the new hires would obtain an earlier job seniority date than the job seniority date of the incumbent employees. D.D. Smith concluded that neither the method nor

1. Plaintiffs did not offer any evidence that Mead's employment of these individuals was discriminatory. No one filed an EEOC charge over these hirings, and plaintiffs' counsel, Mr. Atchison, clearly stated on the record that plaintiffs had no complaints other than the complaints about promotions sought during four promotional sequences, all of which occurred after Mead hired these employees. (October, 1990; June, 1991; March, 1992; and July, 1992).

2. **Hobson's choice** is defined as: [after Thomas Hobson 1631 Eng. liverman; fr. his practice of requiring every customer to take the horse which stood nearest the door] 1: an apparent freedom to take or reject something offered when in actual fact no such freedom exists: an apparent freedom of choice where there is no real alternative: a: the forced acceptance of something whether one likes it or not (as in a so-called free election where only one candidate is proposed) b(1): the necessity of accepting something objectionable through the fact that one would otherwise get nothing at all (as an underpaid job rather than no job at all) (2): the necessity of accepting one of two or more equally objectionable things (as enslavement or annihilation by a conquered people) 2: something that one must accept through want of any real alternative: the object of a Hobson's choice.]

*Webster's Third New International Dictionary* 1076 (1986).

the result was fair or desirable. Accordingly, Mead and the Union entered into negotiations in order to resolve the dilemma.

7. Mead and the Union agreed on January 30, 1990 to give the newly hired employees and the incumbent employees who moved to new positions a common job seniority date of February 19, 1990, the date Mead established the two paper machine crews. This resulted in an earlier job seniority date for a very few incumbent employees who did not move to a new job during the expansion. The vast majority of the employees employed in the expanded paper mill line of progression, both old and new, had a common seniority date of February 19, 1990. In addition, Mead and the Union had agreed earlier that the two paper machines would have a combined line of progression for the purpose of permanent promotions. This meant that if an employee was working in a lower job on the #1 paper machine, he or she would be eligible for consideration for a permanent promotion to the next higher position on the #2 paper machine, and vice-versa.

8. A dispute arose following the January 30, 1990 agreement regarding the means and method of selecting employees for promotions from among those employees having a common job seniority date. Mead believed it had reached an understanding with the Union that it could promote employees in this group based on "qualifications" as defined in Article 12.B of the collective bargaining agreement.[3]

9. The Union, on the other hand, apparently believed that some secondary measure of seniority—such as seniority on a previous job or plant seniority—should govern among those employees having a common job seniority date. Prior job seniority is the length of time an employee has worked on a specific job below the job he currently holds. Plant seniority is the total length of time an employee has worked for Mead at the Mahrt Mill. The Union made such a proposal during negotiations with Mead, but Mead rejected it.

10. The collective bargaining agreement provides that the defendant must fill vacancies occurring in a job classification by promoting one of the employees holding a job in the job classification immediately below the vacancy in question. All eight employees in the job classification below the vacancy in question, except those who are frozen, are both eligible and considered for the promotion. These procedures, as mentioned earlier, are required by the collective bargaining agreement between Mead and the Union.

For example, if a vacancy occurs in the Wet–End Crew Leader job classification, the eight employees holding the job of Wet–End First Helper, which is the job classification immediately below the Wet–End Crew Leader position, are both eligible and considered for the promotion. When one of the eight employees holding the Wet–End First Helper job is promoted to the Wet–End Crew Leader position, a vacancy is then created in

3. Article 12.B provides as follows:
 In permanently increasing the working force or making permanent promotions within the line of progression, employees who have the longest job service on a job just below the job where a vacancy occurs will be given consideration in filling the vacancy based on the following factors:
 (a) Length of service on a job just below the job where the vacancy occurs.
 (b) Ability and fitness.
 (c) Knowledge and training.
 (d) Experience and skill.
 Where factors outlined in "b", "c" and "d" are equal, factor "a" shall govern. In the event factor "a" shall be equal for two (2) or more employees, length of service on previous jobs within the line of progression shall govern. If length of service on previous jobs within the line of progression is also equal on each job, then

plant seniority shall govern. The Management shall determine the qualifications under factors "b," "c" and "d." Should Management's judgment concerning factors "b," "c," and "d" be questioned, the aggrieved employee shall have the right to invoke the grievance procedure.
 If the Company does not follow the principles of seniority in making promotions, the Company shall notify the Union in writing and in case of objections, the Company shall be notified by the Union in writing within ten (10) days. If such objection is filed and if the Union so requests, the Company will give the employee a reasonable trial period.
 When promoted, if the employee fails to qualify after a reasonable trial period, he shall be returned to his former position and shall not be eligible for promotion except in the discretion of the Management for a period of six months.

the Wet–End First Helper classification. The eight employees holding the position of Dry–End Crew Leader, which is the job classification immediately below the Wet–End First Helper job, are both eligible and considered for the promotion. The same procedures are followed down the line of job classifications.

11. These procedures must be distinguished from the procedures used to fill *temporary* vacancies. Under the collective bargaining agreement, the senior employee on a job has the right to, and is expected to, "step up" or "set up" under certain circumstances and fill a temporary vacancy on the next job or two above the job he or she presently holds. In order to insure that a particular employee is qualified to step up or "set up" to the next higher temporary vacancy, the employee is trained on the higher job, when circumstances permit, by the employee holding the higher job. The employee in the lower job classification is also given the opportunity to refine his skills by stepping up to the temporary vacancy.

Defendant's promotion procedures further provide that an employee is usually not allowed to step up to the temporary vacancy until he is "OJT certified" to step up and fill the vacancy. The OJT certification or qualification simply means that the employee is minimally qualified to fill the temporary vacancy. "Stepping up" and filling the next higher job or two as temporary vacancies occur is considered a part of the employee's job duties.

### C. The October, 1990 Promotional Sequence.

#### 1. The Selection Process.

12. Mead terminated the employment of B.E. Watson, a Dry–End Crew Leader, in late September, 1990. This created a vacancy in the position of Dry–End Crew Leader. Mead had decided by this time to use qualifications in promoting employees to higher jobs. Mead did not, however, have in place a formal system or method for measuring the relative qualifications of the employees eligible for promotion. Accordingly, D.D. Smith, together with the Paper Machine Superintendents, their Technical Assistants and those Tour Foremen who were available and familiar with the work of those hourly employees working in the paper machine line of progression, met to determine those employees best qualified to fill the vacancies resulting from Watson's termination ("the October, 1990 promotional sequence" or "the Watson promotions").

D.D. Smith conducted the meeting. Smith had a list of those employees in each job who were eligible for promotion to the vacancies in the next higher job classification. Smith listed the employees' names on a black board. Those present then held a discussion which focused on each vacancy and the eight employees, except those who were frozen, in the job classification immediately below the vacancy in question who were eligible for promotion to the particular vacancy. The group sought to reach a "consensus" on which employee was best qualified for each position. If the group reached a consensus on the best qualified employee, that employee was promoted. When those present concluded that all eight employees in the job classification immediately below the vacancy in question had equal qualifications, Mead, in accordance with the collective bargaining agreement, promoted the employee with the earliest secondary seniority date.

#### 2. The Johnston Arbitration Award.

13. The Watson promotions produced a grievance from the Union on behalf of Mead's employees, including the plaintiffs, who claimed that they were "more senior" than those promoted during the Watson promotions. The Union's grievance resulted in an arbitration hearing before an arbitrator, J. Reese Johnston, Jr., on November 22, 1991. Mead took the position before the arbitrator that it had reached an understanding with the Union that Mead could use qualifications, in accordance with the collective bargaining agreement, to fill promotions when the eligible employees had a common seniority date. Mead also took the position that the use of qualifications was necessitated by common seniority dates. The Union contended that Mead should use a secondary measure of seniority in filling vacancies.

14. Arbitrator Johnston rendered his decision on January 2, 1992. The arbitrator found that Mead had always had the right under Article 12.B of the collective bargaining agreement to promote employees on the basis of qualifications. Arbitrator Johnston also found, based on the language of the collective bargaining agreement, that when both the *job seniority dates* for two employees and *qualifications* are equal, Mead must promote the employee having the earlier previous job seniority date. When two employees had the same job seniority date but Mead did not believe the employees' qualifications were equal, the arbitrator stated, Mead had the right to promote on the basis of qualifications and promote the best qualified employee. The senior employee not selected, the arbitrator noted, had a right to file a grievance over the qualification determination and had the burden of proving that he was equally as qualified as the employee promoted. The arbitrator found that *the Union had wholly failed to prove that the aggrieved employees were as qualified as those actually promoted* during the Watson promotions.

Finally, the arbitrator found that when Mead promoted an employee on the basis of superior qualifications, the aggrieved employee had the right to a reasonable trial period if the employee promoted had a later job seniority date than the aggrieved employee's job seniority date. The arbitrator noted that this was not the situation in the grievance under consideration. The significant result of Arbitrator Johnston's decision was that Mead obtained arbitral approval to use qualifications in all future promotional sequences when selecting employees for promotions.

### 3. *Plaintiffs' Evidence of Qualifications.*

15. Arbitrator Johnston concluded, as mentioned earlier, that the Union had wholly failed to prove that plaintiffs and others were *as qualified* as those selected during the Watson promotional sequence. The court may well be bound by Arbitrator Johnston's findings on this issue. (*See* page 1573, *infra*). Plaintiffs, however, contest the Watson promotions as discriminatory, even though the highest vacancy in this promotional sequence went to a black, Mose Wyatt.

### a) *Williams.*

16. Mead selected Q.W. Cutchens for the position of Dry–End Fourth Helper. Plaintiff Williams claims he should have received this promotion because: (1) he had more job seniority and experience than Cutchens; and (2) no one had told him he was performing poorly. Williams admitted, however, that he did not know if Cutchens had been working in this position as temporary "set up." Indeed, Cutchens was OJT certified for the Fourth Helper position and was actually working that job on the # 1 paper machine. While Cutchens was actually working in the position of Fourth Helper, Williams was receiving classroom training and did not actually work from February 19, 1990 until September, 1990.

Williams also admitted that it was very important for him to receive the classroom training but that he had absentee problems and missed fifteen days of training prior to the Watson promotions. A supervisor, moreover, had counseled Williams about his absentee problem in August, 1990. Cutchens, on the other hand, did not have an absentee problem.

### b) *Henry.*

17. Mead selected J.W. Stinson for the position of Dry–End Third Helper. Plaintiff Henry claims he should have received this job because: (1) he had more secondary seniority than Stinson; (2) he had trained new hires; and (3) he had worked the Third Helper job on a temporary basis. Henry offered no evidence of Stinson's experience or qualifications. The evidence shows that Stinson had the same job seniority date as Henry.

Henry readily admitted that he had performance problems. On one occasion, for example, Henry was outside during his shift and, when he returned, noticed a problem with a dump tank. The tank level was low and Henry dumped a batch of coating into the tank. When the level did not rise after dumping, Henry did not check for a malfunction. Instead, he dumped another batch of coating into the tank which because of a

malfunction, together with the first batch, was pumped onto the floor. Henry also damaged the pump before even searching for the problem and did not find the problem. He received a reprimand in December, 1989, and did not file a grievance or EEOC complaint concerning the reprimand.

Henry received another reprimand on April 30, 1990, for losing over 42 tons of paper because of streaks and "picking." He did not file a grievance or EEOC complaint on this occasion either. Henry also was suspended on August 17, 1990, for failing to take proper action when the paper broke, which lead to excessively wrapped paper in the rolls, jamming them. Henry's failure to disengage the clutch on the rolls caused this problem and resulted in his suspension. He did not file a grievance or EEOC complaint on this occasion either.

### c) Ford.

18. Mead selected G.E. Flourney for the position of Dry–End Second Helper. Plaintiff Ford claims he should have received this promotion because: (1) he had more secondary seniority than Flourney; (2) he had worked the job as a temporary set-up; (3) he had performed a Fifth Helper job at Mead which he claimed was similar to the Second Helper position; and (4) he had trained a new hire for one week.

Ford offered no evidence that the Fifth Helper job he performed had the same duties as Mead's Second Helper job, much less that it qualified him for the Second Helper job. The former Fifth Helper job involved working with a tidling shaft and loading cores. This is not done at Mead anymore. The Fifth Helper job paid considerably less than the Second Helper's position, was lower in the line of progression and did not provide a "set-up" to the First Helper position. In fact, the job has been abolished and does not presently exist.

Ford admitted that Flourney may well have had the same experience working as a Fifth Helper. Ford admitted on cross-examination that he had no idea whether he had worked more set-ups than Flourney had worked and that he believed Flourney had performed temporary "set-ups." In fact, Flourney was OJT certified for the Second Helper position. Ford further admitted that he experienced considerable difficulty in performing the duties of the Second Helper position on the # 2 paper machine when he performed the Second Helper job on a trial basis in 1992. There is no evidence in the record that Flourney had any difficulties.

Ford had two active reprimands at the time of the Watson promotions. Ford received the first reprimand on May 11, 1990 for failing to wear protective equipment while working with liquid chemicals. As a result, Ford suffered an ammonia burn which he could have prevented had he worn protective equipment. Ford received another reprimand on June 11, 1990 for failing to follow the proper procedures in unloading a truck. His failure to follow the proper procedures resulted in over $5,300.00 in lost chemicals and other costs.

### D. The Evaluation Form.

19. Following the Watson promotions, D.D. Smith, the Paper Machine Manager, after discussions with Broughton Kelley, then the Manager of Human Resources, designed an evaluation form to use in evaluation employee qualifications in future promotional sequences occurring in the Paper Machine Department. The evaluation form measured the three qualification elements set forth in the collective bargaining agreement: (1) "ability and fitness"; (2) "knowledge and training"; and (3) "experience and skill." These three elements were further broken down into sub-elements in order to measure employees' demonstrated qualifications on the job to which they were presently assigned and on higher positions to which they might temporarily step up.

20. Smith gave the evaluation form to the evaluators at a staff meeting and instructed them on how to use the form. Smith explained, and the rating sheet states, that evaluators should not rate an employee if they did not believe they had worked with and observed the employee's job performance long enough to conduct a fair rating. The evidence reflects that supervisors, in fact, did not rate certain employees when

they had not worked with them long enough to, in their opinion, conduct a fair rating.

21. Smith also explained that a rating of 5–6 was in the "middle" and indicated that the employee was doing what Mead expected of him. A rating below 5–6, Smith explained, indicated a deficiency in job performance. A rating above 5–6 showed that the employee was above average in performance. Smith warned the evaluators to rate employees fairly. Plaintiffs offered no evidence that the evaluators disregarded Smith's instructions. Finally, Smith told the evaluators that he would compute the average score for each employee and that Mead would promote the employee receiving the highest rating.

22. Smith testified that he devised the evaluation form "to have a written type evaluation that would be something more tangible as far as record keeping and being able to do a better evaluation of employee qualifications." Although Smith did not have any training in the development of evaluation forms, he designed the form based upon his knowledge of the paper industry and his 32 years of experience in the industry. Dave Barrows, the present Human Resources Manager, testified that similar evaluation forms are common throughout the industrial sector. Plaintiffs' own expert testified that the person who designed the form had "good intentions."

23. Three other promotional sequences, involving at least two of the plaintiffs, occurred after the October, 1990 promotional sequence. The first one occurred in June, 1991 ("the June, 1991 promotional sequence"). The second sequence occurred in March, 1992 ("the March, 1992 promotional sequence"). The third and final one occurred in early July, 1992 ("the July, 1992 promotional sequence"). Mead used the evaluation form designed by D.D. Smith in all three of these promotional sequences. Mead promoted the employees receiving the highest ratings in all three of these promotional sequences.

E. *The June, 1991 Promotional Sequence.*

24. Mead used the evaluation form for the first time during the June, 1991 pro-

motions, when two vacancies occurred in the position of Wet–End First Helper and in the other jobs below it in the line of progression. The evaluators used the form in evaluating employee qualifications and returned the completed forms to Smith. Smith's staff then computed an average composite score for each eligible employee. The composite score was computed by adding all of the numerical scores for each scored entry for the employee in question and then dividing that total by the number of scored entries on the form.

25. In order to check for possible favorable or adverse bias, and since this was the first time Mead had used this evaluation form, Smith conducted a second analysis by excluding the highest and lowest scores of those employees who appeared to have either an extraordinarily high or an extraordinarily low rating. Smith then reviewed the results of the second analysis to determine whether the relative standing of the employees changed. The results of the second analysis revealed that the relative numerical standings among the employees was not affected on an overall basis.

1. *Williams.*

26. As a result of Mead's evaluation of qualifications, Mead selected B. Gilmore and M. Headrick instead of plaintiff Williams to fill the vacancies in the Dry–End Fourth Helper position. Williams offered no evidence of either Gilmore's or Headrick's previous experience and qualifications. Williams, on the other hand, had received a written reprimand for violation of Article 16, Group I, Rule # 9, "Inefficiency on the Job," contained in the collective bargaining agreement, shortly before the June, 1991 promotional sequence. Williams had failed to properly set the trail blade wipers correctly on the coater. This resulted in damage to a blade coater backing roll in the amount of approximately $55,000.00. Williams received this reprimand while setting up as a Dry-End Fourth Helper, the job to which he claims he should have been promoted. H.L. Goshay, who is black, administered this written reprimand to Williams. Williams did not file a grievance or EEOC complaint over this

reprimand. Williams received another reprimand for violation of Article 16, Group I, Rule #12 on May 28, 1991, less than a week before the June, 1991 promotional sequence occurred. Williams received this reprimand because of his failure to notify Mead that he would be absent from work that day. Once again, H.L. Goshay, who is black, administered this written reprimand to Williams.

### 2. *Henry.*

27. Mead, as a result of its evaluation of qualifications, selected J. Stinson and R. Blanton instead of plaintiff Henry to fill the vacancies in the Dry–End Third Helper position. Henry did not offer any evidence of either Stinson's or Blanton's prior experience or qualifications.

### 3. *Ford.*

28. Mead, again as a result of its evaluation of employee qualifications, selected G. Flourney (white) and W. Cliatt (black) instead of plaintiff Ford to fill the vacancies in the Dry–End Second Helper position. Flourney was OJT certified for this position. The only reason Ford gave to support his belief that he was more qualified than Cliatt, who is black, was that Cliatt was "still working on that Dry–End Second Helper's job." Cliatt too was OJT certified for the Second Helper position. Hence, both Flourney and Cliatt were OJT trained at the time of the June, 1991 promotions. Finally, Ford admitted that he had difficulties performing the duties of Dry–End Second Helper when he held that job on a trial basis in 1992.

### F. *The March, 1992 Promotional Sequence.*

29. Another promotional sequence occurred in March, 1992. This sequence did not affect plaintiff Ford because the promotional sequence occurred at the level of Dry–End Third Helper and below. Mead, once again, used the evaluation form to measure the eligible employees' qualifications in deciding whom to promote.

### 1. *Williams.*

30. Mead, as a result of evaluating qualifications, selected Q.W. Cutchens to fill the position of Dry–End Fourth Helper. Cutchens was promoted to this position again because he and others were rolled back when Watson was reinstated as a result of Arbitrator Johnston's award. Another vacancy in this position occurred later and Cutchens received it. Plaintiff Williams claims that Mead should have promoted him to this position because Cutchens had signed a waiver stating he did not want a promotion. Williams admitted, however, that Cutchens withdrew the waiver prior to the beginning of this promotional sequence. Williams failed to offer any evidence as to why he believed he was qualified for and deserved this promotion. Williams had also received a reprimand on December 27, 1991 for his failure to provide a satisfactory reason for his absence from work on that day.

### 2. *Henry.*

31. Mead, again as a result of evaluating qualifications, selected W.J. Wellborn, a black employee, for the position of Dry–End Third Helper. Plaintiff Henry claims Mead should have promoted him to this position because: (1) he had performed the job on "set up"; and (2) Wellborn "had never been up there to be trained." Henry later recanted, stating that Wellborn had, in fact, received training for this job and had performed the job on "set up."

### G. *The July, 1992 Promotional Sequence.*

### 1. *Williams.*

32. The final promotional sequence occurred in July, 1992. Mead, once again, used the evaluation form to measure the eligible employees' qualifications in deciding whom to promote. Mead, as a result of evaluating qualifications, initially selected A.R. Borders for the position of Dry–End Fourth Helper. Plaintiff Williams claims Mead should have promoted him to this position. Mead accorded Williams, who had an earlier job seniority date than Borders, a trial period in accordance with Arbitrator Johnston's decision. Williams successfully completed the trial period. Mead, therefore, promoted Williams to the position of Dry–End Fourth Helper on a permanent basis.

### 2. *Henry.*

33. Mead, again as a result of evaluating qualifications, selected Richard Turner instead of plaintiff Henry for the position of Dry–End Third Helper. Henry claims Mead should have promoted him to this position because of his seniority. Turner and Henry, however, had the same job seniority date of February 19, 1990. Arbitrator Johnston's arbitration decision did not require a trial period under these circumstances. Henry presented no evidence of Turner's qualifications or experience.

### 3. *Ford.*

34. Mead, again as a result of evaluating qualifications, selected W.J. Wellborn, a black employee, instead of plaintiff Ford for the position of Dry–End Second Helper. Ford claims he was more qualified for the position than Wellborn because "[t]hey took a guy that wasn't even in my job classification, wasn't even with the eight that was in that job classification." Ford stated on cross-examination that he only meant that he had more job seniority than Wellborn, who was, in fact, one of the eight employees in Ford's job classification. Indeed, Ford had an earlier job seniority date than Wellborn. Mead, therefore, accorded Ford a trial period in accordance with Arbitrator Johnston's decision. Ford did not, as discussed below, successfully complete the trial period.

### 4. *Ford's Disqualification.*

35. Plaintiff Ford had previously worked as a Dry–End Third Helper on the # 1 paper machine. The vacancy in the Dry–End Second Helper position that Ford filled on a trial basis occurred on the # 2 paper machine. Ford was eligible and considered for the position of Dry–End Second Helper on the # 2 paper machine because of the merger of the two lines of progression discussed earlier. Ford began his trial period on the # 2 paper machine in late July, 1992. His supervisor was John W. (Jay) Martin.

36. Ford experienced continuing difficulty in performing his job duties during the trial period. Ford, as he testified, found that the # 2 paper machine operated differently from the # 1 paper machine and that the tasks he had to perform during a paper break on the # 2 paper machine were "completely different." Ford further admitted that his performance during the trial period did not meet Mead's expectations. Ford also admitted that other employees working on the # 2 paper machine did not have the difficulties he had. Ford could not "thread the tail" and Mead had to bring in other employees to perform this function. Ford attributed his problems to harassment by Goshay. Goshay was not, however, Ford's supervisor. Goshay supervised employees working on the # 1 paper machine.

Ford also complains that the reason he failed his trial period is because Mead required him to work "set ups" on the First Helper job. As discussed previously, however, a part of an employee's job duties is to do "set ups" on the next higher position. Ford, moreover, was OJT certified for the First Helper position. In an effort to help Ford successfully complete his trial period, Mead gave him a trial period from July, 1992 to December, 1992. The normal trial period lasts only four weeks. And, Mead did not require Ford to do any "set ups" on the First Helper position during the last month of his trial period. Mead disqualified Ford from working the Dry–End Second Helper job in December, 1992 when Ford showed no significant improvement in his job performance.

### H. *Mead's Promotion of Blacks.*

37. Black employees received a number of promotions sought by plaintiffs. Eleven blacks also received promotions not sought by plaintiffs. Mead, for example, promoted M. Wyatt to the Dry–End Crew Leader position in the June, 1991 promotional sequence. Mead promoted F. Jones to the Dry–End First Helper position in the June, 1991 promotional sequence. Finally, Mead promoted M. Goshay to the Dry–End Fifth Helper position in the June, 1991 promotional sequence. All of these employees, as mentioned earlier, are black.

Black employees also received promotions not sought by plaintiffs in the March, 1992 promotional sequence. Mead, for example, promoted K. Williams to the Dry–End Sixth

Helper position in the March, 1992 promotional sequence. Mead promoted S. Feagin to the Dry–End Seventh Helper position and promoted R. Chambers to the Dry–End Eighth Helper position in the March, 1992 promotional sequence.

Mead promoted C. Rutledge, another black, to the Dry–End Crew Leader position in the July, 1992 promotional sequence. Mead promoted G. Floyd to the Dry–End Sixth Helper position in the July, 1992 promotional sequence. Mead promoted R. Chambers to the Dry–End Seventh Helper position. Finally, Mead promoted C. Phillips and C. Jenkins to the Dry–End Eighth Helper positions in the July, 1992 promotional sequence. All eleven of these employees, as mentioned earlier, are black.

### I. *Plaintiffs' Evidence of Alleged Retaliation.*

38. The Watson promotions occurred before plaintiffs filed their EEOC complaints. Hence, plaintiffs' failure to receive promotions during the Watson promotional sequence cannot be a result of their filing EEOC complaints. Plaintiffs' only evidence that they were retaliated against consists of the facts that they filed EEOC charges and, at various times during the next couple of years, they either were not selected for certain promotions or received reprimands.

### 1. *Williams.*

39. Plaintiff Williams filed his first EEOC complaint on October 10, 1990. Williams received reprimands, including reprimands for absenteeism and tardiness, both before and after he filed his EEOC complaint. Indeed, Williams himself admitted that he violated company policy by not calling in his absence from work on May 28, 1991. Four of the reprimands that Williams received after filing his EEOC complaint were administered by Goshay at a time when Goshay did not even know of Williams' EEOC complaint. Finally, Williams ultimately received a promotion to the position of Dry–End Fourth Helper after he successfully completed a trial period. This promotion occurred after Williams filed his complaint.

### 2. *Henry.*

40. Plaintiff Henry received several reprimands before he filed his EEOC complaint. Henry's only other allegation of retaliation is that Goshay cursed him on occasion. Henry testified, however, that Goshay's alleged cursing also occurred before he filed his EEOC complaint. Henry further testified that Goshay cursed both white and black employees.

### 3. *Ford.*

41. Plaintiff Ford did not receive any reprimands after he filed his initial EEOC charge. Ford claims he failed to successfully complete his trial period on the Dry–End Second Helper position because Mead somehow retaliated against him. Ford admitted, however, that: (1) he had problems on the job; (2) his performance did not meet Mead's expectations; and (3) other employees did not have the problems he had. Finally, none of the plaintiffs offered any evidence that white employees who engaged in similar acts did not receive reprimands.

42. Finally, plaintiffs did not, as discussed in the Conclusions of Law below, produce any credible evidence of disparate impact.

### CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction in this case under 28 U.S.C. §§ 1331, 1337 and 42 U.S.C. § 2000e–5(f)(3). Personal jurisdiction and venue are not contested.

2. In Title VII cases, one party's evidence and proof may be developed in the context of the other party's case, such as by cross-examination. *Barber v. International Bhd. of Boilermakers,* 778 F.2d 750, 755 n. 6 (11th Cir.1985). The defendant, for example, can produce its legitimate reason during plaintiff's case either through adverse witnesses, express statements by the plaintiff, or documentary evidence. *McDaniel v. Temple Indep. Sch. Dist.,* 770 F.2d 1340, 1346–47 n. 3 (5th Cir.1985). The plaintiff must then "prove that the proffered reason is a pretext or that a discriminatory motive more likely than not led to the adverse decision before resting [his or her] case." *Id.* If the court determines that the plaintiff had

the opportunity to satisfy this burden before resting his case but that he failed to do so, it may grant the motion for an involuntary dismissal. *McDaniel,* 770 F.2d at 1345.

■ 3. The defendant in this case produced its legitimate reason with sufficient clarity during plaintiff's case-in-chief, and plaintiff had an opportunity to show pretext before resting. Defendant produced legitimate, nondiscriminatory reasons for promoting others instead of the plaintiffs through cross-examination of the plaintiffs, cross-examination of plaintiffs' witnesses, the testimony of adverse witnesses called by plaintiffs and, finally, through documentary evidence. Plaintiffs had ample opportunity to prove, before resting their case-in-chief, that defendant's articulated reasons were a mere pretext for discrimination. As a result, defendant's Rule 52(c) motion is properly before the Court. *McDaniel,* 770 F.2d at 1345–46.

A. *Plaintiffs' Disparate Impact Claim.*

■ 4. The Supreme Court first announced the disparate impact theory in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Supreme Court held in *Griggs* that when a plaintiff in a Title VII case establishes that an employer maintains a racially neutral employment practice which adversely affects black employees at a substantially higher rate than whites similarly situated, the burden then shifts to the employer to justify the practice as being "related to job performance." *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. The plaintiffs in this case failed to establish a prima facie case of discrimination under the disparate impact theory. Hence, the nature of the employer's burden is irrelevant for the purposes of this opinion.

5. Plaintiffs relied upon certain statistical "evidence" in their effort to create an inference of discrimination under the disparate impact theory. While statistics can play a significant role in employment discrimination cases, statistics are inherently slippery in nature. As the Supreme Court has stated, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted." *International Bhd. of Teamsters v. United States,*

431 U.S. 324, 340, 97 S.Ct. 1843, 1853, 52 L.Ed.2d 396 (1977). The usefulness of statistics "depends on all of the surrounding facts and circumstances." *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1853.

■ 6. The selection of the appropriate labor pool is necessary in order to establish a prima facie case of disparate impact in promotions. *EEOC v. United Va. Bank,* 615 F.2d 147, 149–53 (4th Cir.1980). This is true because the plaintiff, in order to establish adverse impact, must present a "meaningful statistical comparison" between those employees eligible for promotion and those actually promoted. *James v. Wallace,* 533 F.2d 963, 967 (5th Cir.1976). *See generally Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) ("a proper comparison"). In hiring and promotion cases, identification of the appropriate candidate pool and its racial make-up is usually the starting point for impact analysis and serves as the basis for comparison. *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 482 (9th Cir.1983). In promotion cases such as this one, for example, the number of blacks and whites in the appropriate pool provides the basis for calculating the percentage of those employees, both black and white, who were selected or rejected.

■ 7. The best evidence of adverse impact is proof that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of *actual* applicants, or, in promotion and benefit cases, in a proportion smaller than their percentage in the *actual* pool of eligible employees. *Moore,* 708 F.2d at 482; *accord Hester v. Southern Ry. Co.,* 497 F.2d 1374, 1379 (5th Cir.1974). Indeed, the courts, in cases such as this one, should "always" measure disparate impact "against the *actual* pool of applicants or eligible employees unless there is a characteristic of the challenged selection device that makes use of the *actual* pool of applicants or eligible employees inappropriate." *Id.* (emphasis added).

It is also well settled that when a company such as defendant promotes from within, the relevant labor pool for upper level positions

is the actual group of employees from which the company fills those jobs. *Griffin v. Carlin,* 755 F.2d 1516, 1526 (11th Cir.1985); *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 564 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983). Plaintiffs failed to produce any evidence in this case that the actual pool of eligible employees for the promotions in question is incomplete or unreliable. The proper pool for comparison in this case, therefore, is "the actual pool of eligible employees." *Moore,* 708 F.2d at 482.

8. The facts in this case establish that defendant fills a vacancy occurring in a job classification by promoting one of the employees holding a job in the job classification immediately below the vacancy in question. The facts also establish that all eight employees in the job classification immediately below the vacancy in question, except those who are frozen, are both eligible and considered for the promotion. These procedures are required by the collective bargaining agreement between Mead and the Union.

9. Plaintiffs have ignored the actual pool of eligible employees from which defendant fills jobs. Plaintiffs' statistical pool does not include all eight eligible employees in the job classification immediately below the vacancy in question. Plaintiffs have improperly excluded eligible whites from the pool but not eligible blacks similarly situated. Plaintiffs have also excluded from the pool other eligible employees based on the relationship between their seniority and the seniority of the person promoted. Plaintiffs' manipulation of the pool results in a skewed and inflated selection rate for whites as compared to blacks.

Under plaintiffs' methodology, the employee who is promoted, whether black or white, is counted as qualified and is included in the pool. If a white is promoted instead of a black with greater seniority, plaintiffs count the black as qualified, but not promoted, and include him in the pool. If, on the other hand, any employee, black or white, is promoted instead of a white employee with greater seniority, plaintiffs do not count the white as qualified and do not include him in the pool, even though he is both eligible and

considered for the promotion. Plaintiffs also exclude from the pool the employees with less seniority than the employee who is promoted. This is true even though they too are employees in the job classification immediately below the vacancy in question and are eligible and considered for the promotion.

Thus, plaintiffs count black employees with more seniority than the employee promoted as qualified and include them in the pool, while plaintiffs exclude from the pool white employees with more seniority than the employee promoted. Plaintiffs' methodology yields a 100% selection rate for white employees, even though a large number of black employees have been promoted over whites. In contrast, plaintiffs' selection of the improper pool yields a substantially smaller selection rate for black employees, even though, as stated, a large number of black employees have been promoted over whites. Plaintiffs have ignored both the actual number and racial composition of the employees eligible for promotion. Plaintiffs' "statistics" are both "underinclusive" (*Weir v. Litton Bionetics, Inc.,* 43 FEP 663, 667, 1987 WL 12354 (D.Md.1987)) and based on "misleading sample sizes." *Progressive Officers Club, Inc., v. Metro Dade County,* 54 FEP 1161, 1173, 1990 WL 270786 (S.D.Fla.1989).

10. Plaintiffs did not even attempt to show disparate impact in promotion to the higher level jobs through a comparison with the pool of *actual* promotion applicants. *Moore,* 708 F.2d at 484. Plaintiffs' numbers are meaningless because, without evidence of the pool of available and qualified applicants, the court cannot determine whether the selections of blacks are disproportionately small to the pool, disproportionately large, or approximately statistically perfect. *Whiteacre v. Davey,* 890 F.2d 1168, 1172 (D.C.Cir. 1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). Plaintiffs failed to establish a prima facie case of discrimination under the disparate impact theory because statistics based on an improper labor pool "have no probative value." *Cox v. City of Chicago,* 868 F.2d 217, 221 (7th Cir. 1989); *see, e.g., Pouncey v. Prudential Ins. Co.,* 668 F.2d 795, 803 (5th Cir.1982) (statistics on the number of blacks holding a partic-

ular job do not create an inference of discrimination in the absence of "the required comparison to a qualified pool of employees eligible for promotion").

■ 11. Plaintiffs failed to establish a prima facie case under the disparate impact theory for an additional reason. The proper pool in this case is the actual pool of eligible employees from which defendant made promotions, not a sub-group. *McAlester v. United Air Lines*, 851 F.2d 1249, 1258 (10th Cir.1988). Since plaintiffs failed to establish adverse impact within the larger and actual pool of eligible employees as a whole, it is not proper to break the group down into subgroups with so few members as one and to find a prima facie case within a sub-group when such finding is not permissible for the larger group of which the sub-group is a part. *United Va. Bank*, 615 F.2d at 153. The statistical evidence presented by plaintiffs, therefore, does not prove a prima facie case of discrimination.

12. Finally, plaintiffs failed to show that qualified black employees were not promoted in rough parity to their numbers in the promotional pool from which defendant filled jobs. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 564 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983). There is simply no evidence from this Court can find that defendant's selection process selected employees in a racial pattern significantly different from the actual racial make-up of the appropriate pool. For this final reason, plaintiffs failed to establish a prima facie case of disparate impact. *Gilchrist v. Bolger*, 733 F.2d 1551, 1554 (11th Cir.1984).

**B. *Plaintiffs' Attack on Defendant's Seniority System.***

13. Section 703(h) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), "afford[s] special treatment" to seniority systems. *Trans World Airlines v. Hardison*, 432 U.S. 63, 81, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977). Section 703(h) provides that "[n]otwithstanding any other provision of this [title], it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of

employment pursuant to a *bona fide seniority system* ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(h) (emphasis added). The protections afforded by § 703(h) apply to bona fide seniority systems created after, as well as before, the passage of Title VII. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75–76, 102 S.Ct. 1534, 1541, 71 L.Ed.2d 748 (1982).

■ 14. As a result of § 703(h), the routine operation of a bona fide, facially neutral seniority system is not a violation of Title VII, even if the system has an adverse impact on minorities or women. The Supreme Court has held repeatedly that "the fact that a seniority system has a discriminatory impact is not alone sufficient to invalidate the system." *American Tobacco Co.*, 456 U.S. at 65, 102 S.Ct. at 1535; *see Pullman–Standard v. Swint*, 456 U.S. 273, 277, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982) (under § 703(h), "a showing of disparate impact is insufficient to invalidate a seniority system, even though the result may be to perpetuate pre-Act discrimination"); *Trans World Airlines*, 432 U.S. at 82, 97 S.Ct. at 2276 ("absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences"); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 349 & 353, 97 S.Ct. 1843, 1861, 1863, 52 L.Ed.2d 396 (1977) (rejecting the EEOC's argument that a seniority system is not "bona fide" and loses § 703(h) protection if it has an adverse impact on minorities or women).

■ A seniority system violates Title VII only if there is "actual intent to discriminate on racial grounds on the part of those who negotiated or maintained the system." *Pullman–Standard*, 456 U.S. at 289, 102 S.Ct. at 1790; *accord American Tobacco Co.*, 456 U.S. at 65, 102 S.Ct. at 1535 ("actual intent to discriminate must be proved"); *Trans World Airlines*, 432 U.S. at 82, 97 S.Ct. at 2276 ("a discriminatory purpose"). It is improper to infer an intent to discriminate from discriminatory effects alone. A claim that a seniority system has discriminatory impact must be

accompanied by proof of discriminatory purpose. *Patterson*, 456 U.S. at 69, 102 S.Ct. at 1538.

15. While Title VII does not define the term "seniority system," the Supreme Court addressed the meaning of this term in *California Brewers Ass'n v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980). In *Bryant*, the Court stated that an analysis of the meaning of "seniority system" should begin with "commonly accepted notions about 'seniority' in industrial relations" considered "in the context of Title VII and this country's labor policy." *Bryant*, 444 U.S. at 605, 100 S.Ct. at 819. The Court observed that "[i]n the area of labor relations, 'seniority' is a term that connotes length of employment." *Id.* A "seniority system," the Court declared, "is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase." *Id.* at 605–06, 100 S.Ct. at 819. The "principal feature" of a seniority system, the Court concluded, is that "preferential treatment is dispensed on the basis of some measure of time served in employment." *Id.* at 606, 100 S.Ct. at 819.

■ 16. The promotion procedures set forth in Article 12.B of the collective bargaining agreement between Mead and the Union dated November 1, 1986 clearly fall within the Supreme Court's definition of "seniority system." Promotions at Mead are based upon seniority "in tandem with non-'seniority' criteria"—qualifications. *Bryant*, 444 U.S. at 606 & n. 13, 100 S.Ct. at 819 n. 13. For example, when an employee with a later job seniority date is selected over an employee with an earlier job seniority date based on qualifications, the employee with the longer job seniority who was "passed over" can initiate a grievance and obtain a trial period because of his longer seniority. If the employee with longer job seniority successfully completes the trial period, defendant must promote him to the job on a permanent basis.

In the situation where *both* the qualifications *and* job seniority dates for two employees are equal, the defendant must promote the employee with the earlier previous job seniority date. If this procedure fails to resolve the issue, plant seniority governs. Thus, employees who have longer job seniority, longer previous job seniority and longer plant seniority are accorded "preferential treatment" in the promotion process. *Bryant*, 444 U.S. at 606, 100 S.Ct. at 819. Defendant's promotion procedures, therefore, are part of a "seniority system" as defined by the Supreme Court.

■ 17. Defendant's seniority system is also a "bona fide seniority system" within the meaning of § 703(h). In determining whether a particular employer's seniority system is "bona fide," the courts consider the following factors: (1) whether the seniority system operates to discourage all employees equally from transferring between seniority units; (2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice); (3) whether the seniority system had its genesis in racial discrimination; and (4) whether the system was negotiated and has been maintained free from any illegal purpose. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 352 (5th Cir.1977) (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 355–56, 97 S.Ct. 1843, 1864–65, 52 L.Ed.2d 396 (1977)), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). These factors are not exclusive, however. The Court can also consider the totality of the circumstances in the development and maintenance of the system. *Id.* See, *e.g.*, *Faulkner v. Republic Steel Corp.*, 30 FEP 555, 1979 WL 91 (N.D.Ala.1979).

First, defendant's seniority system is facially neutral and applied equally to all races. *Pullman–Standard*, 456 U.S. at 279, 102 S.Ct. at 1785. The evidence establishes that the same seniority rules apply to all employees, black or white. When an employee is promoted to a higher position, he begins accumulating job seniority in the new position. While any subsequent promotion is based in part on the newly accumulated job seniority, the employee, whether black or white, retains the advantages of his previous job seniority and his plant seniority. To the extent defendant's seniority system " 'locks'

employees into [certain] jobs, it does so for all." *Teamsters*, 431 U.S. at 355–56, 97 S.Ct. at 1864–65; *see, e.g., Gantlin v. West Va. Pulp & Paper Co.*, 734 F.2d 980 (4th Cir. 1984).

The second factor set forth in *James* also compels the conclusion that defendant's seniority system is bona fide. The employees in the paper machine department are members of the same bargaining unit. There has always been only one line of progression or "seniority unit" in this bargaining unit. Prior to the addition of the second paper machine, there was one line of progression for permanent promotions. Immediately before the second paper machine, began production, the jobs on the two paper machines were merged to establish a single line of progression for permanent promotions. As a result, an employee, whether black or white, working in a position on the # 1 paper machine is eligible for consideration for a promotion to a higher position on the # 2 paper machine, and vice versa. The structure of defendant's seniority system, therefore, does not disadvantage blacks.

Third, there is no evidence that defendant's seniority system "had its genesis in racial discrimination." *James*, 559 F.2d at 352. The promotion procedures involved in this case were included in the first collective bargaining agreement negotiated between Mead and the Union. These same procedures are included in the labor contract dated November 1, 1986. These promotion procedures, which are facially neutral, were agreed to at a time when the paper machine department did not employ any blacks. The original agreement, therefore, did not, and could not, establish promotion procedures preferential to whites and detrimental to blacks in the paper machine department. The system, since its inception, has also been "applie[d] equally to all races." *Teamsters*, 431 U.S. at 355, 97 S.Ct. at 1865. There is simply no evidence that the seniority system was adopted with a racial purpose in mind. Defendant's facially neutral seniority system, therefore, did not have "its genesis in racial discrimination." *James*, 559 F.2d at 352.

Fourth, defendant's seniority system, as stated above, did not have its genesis in racial discrimination and was not negotiated for an illegal purpose. Similarly, there is no evidence that defendant's system has been maintained for an illegal purpose. Defendant's promotion procedures and seniority system were "bargained for by a union representing both black and white employees" and defendant's promotion procedures contained in its seniority system, as in *Gantlin*, are "facially neutral and applied both on their face and in practice to black and white employees in the same manner." *Gantlin*, 734 F.2d at 989. Plaintiffs offered no evidence to the contrary.

18. The foregoing discussion establishes that defendant's seniority system is "entirely bona fide" within the meaning of § 703(h). *Teamsters*, 431 U.S. at 353, 97 S.Ct. at 1863. The "unmistakable purpose of § 703(h)," moreover, "was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII." *Id.* Defendant's facially neutral and bona fide seniority system is not subject to attack under the disparate impact theory because plaintiffs failed to produce any evidence of an "actual intent to discriminate on racial grounds on the part of those who negotiated or maintained the system." *Pullman–Standard*, 456 U.S. at 289, 97 S.Ct. at 1790. Plaintiffs also failed to produce any probative evidence, based on the proper labor pool, of adverse impact on black employees as a result of defendant's promotion procedures and seniority system. Accordingly, the court will grant defendant's motion for judgment on plaintiffs' disparate impact claim.

C. *Plaintiffs' Disparate Treatment Promotion Claims.*

19. The plaintiffs in this case have elected to proceed under the disparate treatment theory as well as the disparate impact theory. The plaintiff in a disparate treatment case such as this one must prove "intentional discrimination" in order to prevail. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in a Title VII disparate treatment case. *International Bhd. of*

*Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *see United States Postal Service v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528–29 (11th Cir.1983) ("discriminatory motive, purpose or animus").

 20. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII hiring case, the Supreme Court held that a plaintiff must carry the initial burden of establishing a prima facie case of discrimination. A plaintiff alleging disparate treatment may establish a prima facie case of discrimination either by "circumstantial evidence," *McDonnell Douglas Corp.*, 411 U.S. at 792, 93 S.Ct. 1817, or by producing "credible direct evidence of discriminatory intent." *Smith v. Horner*, 839 F.2d 1530, 1536 (11th Cir.1988). A plaintiff can establish a prima facie case of race discrimination based on circumstantial evidence in a Title VII promotion case by showing: (1) he or she is a member of a protected minority, (2) was qualified for and applied for the promotion, (3) was rejected despite these qualifications, and (4) other employees with equal or lesser qualifications who were not members of the protected minority were promoted. *Smith*, 839 F.2d at 1536; *see Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989); *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 n. 7 (11th Cir.1983).

 21. If the plaintiff succeeds in establishing a prima facie case through circumstantial evidence, the defendant only has the burden of articulating or producing evidence, but not persuading, that plaintiff was rejected, or someone else was preferred, for a "legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the prima facie case " 'drops from the case.' " *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (*quoting Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1094 n. 10). This is true

because once the defendant articulates a legitimate, nondiscriminatory reason for its actions, the nondiscriminatory reasons just as readily explain the difference in treatment. *Nix v. WLCY Radio*, 738 F.2d 1181, 1186 (11th Cir.1984).

22. If the defendant succeeds in rebutting plaintiff's prima facie case, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094. The plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990).

 Under the *McDonnell Douglas/Burdine* method of proof scheme, the "ultimate question" is "whether the defendant intentionally discriminated against the plaintiff." *United States Postal Service*, 460 U.S. at 714–15, 103 S.Ct. at 1481–82, and " '[t]he ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *St. Mary's Honor Ctr.*, —— U.S. at ——, 113 S.Ct. at 2747 (*quoting Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093). Under this method, the plaintiff must in fact persuade the court that the defendant acted with a discriminatory purpose. *Clark*, 717 F.2d at 529 n. 5. If, on the other hand, the plaintiff produces "credible direct evidence of discriminatory intent," the burden shifts to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached even absent the discriminatory intent. *Smith*, 839 F.2d at 1536.

 23. The law is well settled that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age [here race], constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989); *see, e.g., EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1072 (11th Cir.1990) ("Blacks were so subjected to racially hostile

remarks by managers and supervisors that the trial court found the atmosphere to be 'charged with racial hostility' "); *Bell v. Birmingham Linen Service,* 715 F.2d 1552 (11th Cir.1983) (plaintiff's supervisor made a *direct* statement of bias to plaintiff *at the very moment* he rejected the plaintiff for a promotion), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). There is no such evidence here. Plaintiffs produced, at best, only "stray remarks in the workplace," "statements by nondecisionmakers," and "[alleged] statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). These statements do not "justify requiring the employer to prove that its hiring and promotion decisions were based on legitimate criteria." *Id.*

24. As discussed on pages 46–48, *infra,* there is no credible evidence in this case that defendant ever addressed any racially derogatory remarks to any of the plaintiffs and no such statements "related to the selection of an employee for a particular promotion." *Aikens v. Bolger,* 33 FEP 1697, 1699, 1984 WL 48949 (D.D.C.1984) *aff'd mem.,* 755 F.2d 181 (1985). The alleged direct evidence relied upon by plaintiffs, even if accepted as true, was "unrelated to the decisional process" and, therefore, is insufficient to demonstrate that the employer relied on illegitimate criteria in making promotions. *Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir.1989); *see, e.g., Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1553 & 1558 (11th Cir.1988).

Since plaintiffs failed to provide "the requisite nexus" between the alleged statements and the defendant's promotion decisions to demonstrate that plaintiffs' race was a "substantial factor" in the defendant's decisions, the "burden-shifting framework for mixed motive cases in *Price Waterhouse* is inapplicable here." *Smith,* 875 F.2d at 1330. Instead, " '[t]he ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (*quoting Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

25. Plaintiffs failed to establish a prima facie case of race discrimination on their promotion claims because they failed to show that "equally or less qualified [whites] were promoted" to jobs sought by plaintiffs. *Wu v. Thomas,* 847 F.2d 1480, 1484 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). Defendant, during the Watson promotional sequence, promoted those employees about whom a "consensus" was reached that he or she was best qualified for the position in question. Secondary seniority was the determining factor when the decisionmakers could not reach a consensus as to who was best qualified.

Defendant, in the remaining promotional sequences, promoted the employees with the highest composite score on the evaluation form. Plaintiffs, on the other hand, simply testified that they were more qualified than the persons selected. Plaintiffs' "conclusory" allegations that they were "more qualified" than the persons promoted are insufficient to establish a prima facie case of discrimination. *Pugh v. Heinrich,* 695 F.Supp. 533, 541 & 543 (M.D.Fla.1988), *aff'd mem.,* 933 F.2d 1020 (11th Cir.1991).

26. Plaintiffs failed to establish a prima facie case for an additional reason. Mead promoted a number of black employees to positions which plaintiffs, who are also black, sought. Thus, the Court "cannot accept discrimination as a plausible explanation for [defendant's] decision." *Adams v. Reed,* 567 F.2d 1283, 1287 (5th Cir.1978); *accord Crawford v. United States Steel Corp.,* 660 F.2d 663, 667 (5th Cir. Nov. 1981). For this additional reason, plaintiffs failed to establish a prima facie case of racial discrimination.

27. Even if it is assumed that plaintiffs established a prima facie case, defendant is still entitled to a judgment in its favor. This is true because plaintiffs failed to produce any evidence that defendant's legitimate, nondiscriminatory reasons for promoting other employees instead of the plaintiffs were a pretext for discrimination. Defendant promoted the employees "it believe[d] [were] best qualified." *Clark,* 717 F.2d at 527. The promotion of an employee who is

deemed more qualified than the plaintiff for the position in question is a legitimate, nondiscriminatory reason. *Olafson v. Dade County School Bd.*, 651 F.2d 393, 395 (5th Cir. July 1981). Defendant's evidence of a legitimate, nondiscriminatory reason for its action completely rebuts the inference of discrimination raised by plaintiffs' initial showing. *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir.1987).

28. Plaintiffs, on the other hand, failed to produce any evidence that defendant's legitimate, nondiscriminatory reasons for selecting other employees instead of the plaintiffs were a mere pretext for discrimination. The only evidence offered by plaintiffs in their attempt to prove racial animus is that Mr. Goshay, a black supervisor, other supervisors and the plaintiffs themselves used, at some time in the past, a hand signal to identify and communicate with black employees and that Mr. Goshay and nonsupervisory employees made racial slurs. The hand signal consisted of a circular motion made with the hand in front of the face. For example, if there were two employees, one white and one black, talking to one another and another employee needed to talk to the black employee, he or she would use the hand signal to gain the black employee's attention. This hand signal, and other additional hand signals used to communicate with other employees, were used because of the noisy paper machine process. Mead's employees, both supervisory and nonsupervisory, no longer use the hand signal, as plaintiff Ford admitted.

In addition, none of the persons accused of using these signals or making slurs, other than Goshay, who is black and who does not view the prior use of hand signals as derogatory, were involved in the promotion process. The law is well settled that statements by employees who are not decisionmakers do not create an inference of discrimination. *See, e.g., Mauter*, 825 F.2d at 1558.

Plaintiffs Ford and Henry testified that Goshay used the term "nigger" on a number of occasions. Mitch Southall, a Dry–End Second Helper and Union steward, testified that Mr. Goshay referred to the plaintiffs as "black gummy bears" and "three black stooges." Southall also testified that he has heard Mr. Goshay use the word "nigger." Southall, however, had an altercation with Goshay within two weeks before the trial of this action commenced.

Goshay vehemently denied plaintiffs' accusations. While Goshay admitted that he may have used the term "nigger" at some point in his life, he denied using this term at the plant. John Martin, a tour foreman, also testified that he had never heard either Goshay or any other supervisor use racial slurs. Goshay and Martin were credible witnesses. The Court credits Goshay's testimony because it is highly unlikely that Goshay used such derogatory language about members of his own race. Goshay also asked plaintiff Ford and other black employees to take Mead's supervisory training program. Ford refused this opportunity. For all of these reasons, the Court believes Mr. Goshay on this evidentiary issue instead of the testimony presented by plaintiffs.

29. In any event, the prior use of the hand signals and Goshay's alleged statements do not create an inference of discrimination because plaintiffs failed to show that any such signals and remarks played any part in the defendant's promotional process. *See Barber v. International Bhd. of Boilermakers*, 778 F.2d 750, 761 (11th Cir.1985) (holding that statement by employer that plaintiff was "a smart ass nigger" did not carry plaintiff's "ultimate burden of proof" when statement was unrelated to the referral practice at issue). The "probative value of [the hand signal and alleged racial slurs] simply is too attenuated to be of legal significance." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).

30. Mr. Goshay, moreover, was only one of *many* employees involved in the supervision and evaluation of plaintiffs. Defendant, when deciding whom to promote, relied upon either a consensus determination resulting from a meeting of supervisors or upon composite scores calculated from the ratings of many supervisors. Plaintiffs totally failed to establish a causal connection between any alleged racial animus and the promotional procedures employed by defendant. Plaintiffs failed to produce any evidence that ei-

ther promotion system was designed, implemented or operated to discriminate against plaintiffs or the protected group to which they belong. And, as found earlier, plaintiffs failed to produce any probative evidence of disparate impact.

31. Plaintiffs' attack on the Johnston arbitration award also fails. The law is well settled that the question of interpretation of the collective bargaining agreement is a question for the arbitrator. *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). As long as "the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Steelworkers,* 363 U.S. at 599, 80 S.Ct. at 1362. While "findings of the arbitrator with regard to discrimination issues are not binding on the court ... under the *Steelworkers Trilogy,* the arbitral decision is final and binding to the extent it resolves questions of contractual rights." *Owens v. Texaco, Inc.,* 857 F.2d 262, 265 (5th Cir.1988) (*citing United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)), *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

Arbitrator Johnston's award involved an interpretation of the collective bargaining agreement involved in this action, including the parties' contractual rights. The parties and the court, therefore, are "bound by the arbitrator's interpretation of the bargaining agreement and status of the parties." *Owens,* 857 F.2d at 265. Plaintiffs provided the Court with no legal authority to the contrary. Plaintiffs' remaining arguments are also without merit.

32. In sum, defendant promoted the employees who had the highest rating on the performance evaluations. Defendant also "chose the person[s] it thought best qualified for the job[s]" in question. *Smith v. Horner,* 839 F.2d 1530, 1539 (11th Cir.1988). Plain-

tiffs offered no evidence of pretext and the "mere utterance of an ethnic or racial epithet is insufficient to carry [the plaintiff's] ultimate burden of proof." *Barber,* 778 F.2d at 761. Plaintiffs failed to prove racial discrimination because "nondiscriminatory reasons just as readily explain the [alleged] difference in treatment." *Nix,* 738 F.2d at 1186. This Court, therefore, will grant defendant's motion for judgment on plaintiffs' promotion claims.

D. *Plaintiffs' Retaliation Claims.*

33. A plaintiff can establish a prima facie case of "retaliation" under Title VII by showing: (1) he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) he was disadvantaged by an action of his employer either simultaneously or subsequent to such opposition or participation; and (3) there is a causal connection between the protected activity and the employer's actions. *Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir.1992); *Whatley v. M.A.R.T.A.,* 632 F.2d 1325, 1328 (5th Cir. Unit B 1980). In order to establish the causal connection between his protected activity and the adverse employment action, the plaintiff must demonstrate that the filing of a charge with the EEOC "was a 'but for' cause of the adverse employment decision.... If the employee does not bear that burden of persuasion, he may not prevail." *McDaniel v. Temple Indep. Sch. Dist.,* 770 F.2d 1340, 1346 (5th Cir.1985).

34. Plaintiffs in this case did not demonstrate any causal link between their protected activity and the adverse employment action, and therefore plaintiffs failed to establish a prima facie case of retaliatory discrimination. *Hamm v. Univ. of South Fla.,* 35 FEP 1879, 1886, 1984 WL 48907 (M.D.Fla.1984). Plaintiffs failed to show that defendant intended to retaliate against them or that defendant took adverse employment action against plaintiffs because of their engagement in protected activity. Plaintiffs showed no "causal connection" between defendant's decision to promote others instead of plaintiffs and plaintiffs' filing of EEOC charges. Likewise, plaintiffs showed no

"causal connection" between defendant's decision to discipline plaintiffs and the EEOC charges filed by plaintiffs. Plaintiffs also failed to produce any evidence that the use of hand signals or racial slurs had any "causal connection" to their EEOC charges. Plaintiffs, therefore, failed to establish a prima facie case on their retaliation claims.

■ 35. If it is assumed that plaintiffs established a prima facie case of retaliation, the defendant rebutted that presumption by demonstrating legitimate, nondiscriminatory business reasons for each of the actions undertaken. These legitimate business reasons include the selection of other employees with "superior qualifications."

36. The evidence also shows that defendant's conduct about which plaintiffs complain occurred both before and after plaintiffs filed their EEOC complaint. And, plaintiffs failed to offer any evidence that white employees who engaged in similar acts did not receive reprimands. Plaintiff Williams, moreover, received a promotion to the position of Dry–End Fourth Helper after he successfully completed a trial period. This promotion occurred *after* Williams filed his EEOC complaint. Plaintiffs have failed to prove that defendant retaliated against them for engaging in protected activity. For all of these reasons, the court will enter a judgment in favor of defendant on plaintiffs' retaliation claims. *See, e.g., Reed v. Michigan Bell Tel. Co.*, 35 FEP 204, 1984 WL 993 (E.D.Mich.1984).

Based on the foregoing Findings of Fact and Conclusions of Law, the court hereby grants defendant's motion for judgment on all of plaintiffs' claims asserted in this action. The court will enter an appropriate order.

### JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law entered contemporaneously herewith, it is

CONSIDERED, ORDERED and ADJUDGED that judgment be and the same is hereby entered in favor of the defendant, Mead Coated Board, Inc., and against the plaintiffs, Michael L. Williams, Wonder B. Henry, Jr., and Carey Ford.

All costs herein incurred are hereby taxed against the plaintiffs, for which let execution issue.