**A.J. PRIETO, Kathleen Wolfe, and Rigoberto Olivera, individually and as class representatives, Plaintiffs**

v.

**CITY OF MIAMI BEACH, a political Subdivision of the State of Florida and a Municipality, Defendant**

No. 98–1968–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 14, 2002.

Loren Stuart Granoff, Rozencwaig & Granoff, Miami, FL, for plaintiffs.

James C. Crosland, Denise Marie Heekin, Muller Mintz, Miami, FL, Donald Mark Papy, Miami, FL, for defendant.

ORDER GRANTING SUMMARY JUDGMENT

JORDAN, District Judge.

The individual plaintiffs and all other class members are police officers who became employees of the City of Miami Beach on or after June 10, 1993. As individuals and as class representatives, they sue the City for discrimination based on race and/or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Florida Civil Rights Act of 1992 (FCRA), Fla. Stat. § 760.10, *et seq.*[1] Specifically, the plaintiffs, two Hispanic males and one black female, allege disparate treatment in violation of Title VII and the FCRA (Counts I and III) and disparate impact in violation of Title VII and the FCRA (Counts II and IV). The plaintiffs contend that the City's two-tier wage and pension system, which set up different pay scales for those hired before and after June 10, 1993, and which was implemented as part of a collective bargaining agreement between the City and the Fraternal Order of Police (FOP), violates Title VII because it discriminates against minority police officers.[2] The City has moved for summary judgment on all of the plaintiffs' claims, and for the reasons set forth below, that motion [D.E. 57] is GRANTED.

I. THE RELEVANT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact

1. The plaintiffs' disparate treatment and disparate impact claims brought pursuant to Florida's Civil Rights Act will be analyzed under Title VII law, as federal case law dealing with Title VII is applicable to employment discrimination claims brought under Florida law. *See Maniccia v. Brown,* 171 F.3d 1364, 1368, n. 2 (11th Cir.1999) (citing *Florida Dep't of Community Affairs v. Bryant,* 586 So.2d 1205, 1209 (Fla.Dist.Ct.App.1991) (because Florida's Civil Rights Act is patterned after Title VII, federal case law dealing with Title VII is applicable to employment discrimination claims brought under Florida law))

2. The plaintiffs allege in their complaint that because they are Hispanic, *female* and black police officers, the City has engaged in discriminatory treatment of these protected groups. But as the City points out in its motion for summary judgment, a claim of gender discrimination cannot be sustained, as the plaintiffs' complaint is limited by the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination. Here, the EEOC letter of determination states that the charging party "alleges discrimination based on race and/or national origin." Consequently, the plaintiffs are barred from alleging gender discrimination. *See Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110 (7th Cir.1992) ("an aggrieved employee may not complain to the EEOC of only certain instances of discrimination, then seek judicial relief for different instances of discrimination"). Likewise, the plaintiffs' gender discrimination claim under the FCRA is barred. *See Trumbull v. Health Care and Retirement Corp. of Am.,* 756 F.Supp. 532, 535 (M.D.Fla.1991) (holding that substantive aspects of claims under federal discrimination statutes and FCRA are identical), *aff'd,* 949 F.2d 1162 (11th Cir.1991). The discussion which follows is therefore limited to the plaintiffs' claims of race and/or national origin discrimination.

is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Elecs. North Am., Inc.,* 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiffs, the non-moving parties, there is evidence on which the trier of fact could reasonably find a verdict in their favor. *See Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn,* 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997).

## II. THE MATERIAL FACTS [3]

Named plaintiffs A.J. Prieto, Kathleen Wolfe, and Rigoberto Olivera are City of Miami Beach police officers. Mr. Prieto and Mr. Olivera are white, Hispanic males and Ms. Wolfe is a black female. Mr. Prieto and Mr. Olivera were hired as police officers by the City on June 28, 1993, and Ms. Wolfe was hired as a police officer on May 16, 1994.

On February 12, 1997, the plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Rights, alleging that the City discriminated against them because it paid them 15% less than it paid officers hired before June 10, 1993, based on a two-tier wage system.

Mr. Prieto and Mr. Olivera alleged discrimination based on national origin, and Ms. Wolfe alleged discrimination based on race. As explained below, the two-tier wage system was implemented pursuant to terms negotiated in a collective bargaining agreement between the City and the Fraternal Order of Police William Nichols Lodge No. 8(FOP), the collective bargaining representative for a bargaining unit comprised of the City's police officers, including the plaintiffs.

### A. THE TWO-TIER WAGE SYSTEM

The City, a municipal corporation organized and existing under the laws of the State of Florida, is bound by the decisions of its governing and legislative body, the City Commission. As the governing body for the City, the City Commission has the authority to negotiate collective bargaining agreements on behalf of the City.

The City's declining fiscal health and pension reform became an issue in the 1991 City Commission elections. Consequently, on June 19, 1991, the City Commission voted to establish a citizen's committee to review potential changes in benefit levels to each of the City's three pension systems: the General Employees' Retirement System, the Fire/Police Pension Systems, and the Unclassified Employees' Retirement System. The resulting committee, the Pension Systems Review Committee (PSRC), presented its findings on January 10, 1992, in a report entitled "City of Miami Beach Pension Systems Review Committee Final Report and Recommendations," otherwise known

---

**3.** Under Local Rule 7.5, all material facts set forth in the statement served by the moving party will be deemed admitted unless controverted by the opposing party's statement. The plaintiffs' statement in opposition to the City's statement of undisputed facts [D.E. 67], rather than specifically disputing the City's proffered facts, re-argues the theories of dis-

crimination first alleged in the complaint and later argued in the opposition to summary judgment, but offers no evidence to contradict the City's facts. Consequently, unless otherwise noted, the facts include those set forth in the City's statement of material facts, which are undisputed for purposes of this summary judgment motion.

as the "Green Report." The PSRC's goal was to "review and analyze all of the City's Pension Systems so as to identify any areas in which benefit modifications, cost containment, or cost reduction, would benefit the citizens of the City of Miami Beach, and to close any loopholes which would allow any form of unjust enrichment." Pension reform was also previously recommended by the City's Budget Advisory Committee (BAC) back in 1990–1991, a citizens' committee which made recommendations to the City Commission.

The PSRC initially considered reducing existing benefits for current employees but discovered that changing pension benefits for existing general employees and fire/police would require going through the collective bargaining process. Consequently, in November of 1991, the PSRC recommended a bifurcated pension plan in which all new City employees would receive a reduced benefits package. The PSRC anticipated a calculated savings of $13.7 million over the following 10 years with successful implementation of the new benefits package.

Roger Carlton became the new City Manager on March 30, 1992. The Commission informed him that one of his tasks would be to restore the City's fiscal health. To that end, an analysis of the City's financial condition was undertaken by the City's Finance Director, Robert J. Nachlinger, resulting in a report entitled the "City of Miami Beach, Florida, Fiscal Health Analysis and Financial Responsibility Program as of September 30, 1991." In order to prevent the City from receiving a lower bond rating, which would have adversely affected the City's goal of capital improvements, the Fiscal Health Report was also presented to bond rating agencies like Moody's and Standard and Poor's as evidence that the City was taking steps to improve its finances.

The Fiscal Health Report outlined a five-year plan to restore the City's financial health. Noting that the City had experienced basic budget imbalances for nine years, the report suggested, along with many other cost-saving and organizational measures, that the City reduce its payroll costs through reductions of personnel or the implementation of a two-tier salary structure, with all new City employees' entry level salaries being reduced by approximately 20%. It also identified the pension systems as being in need of restructuring, and noted that the PSRC had already recommended implementation of a reduced level of benefits for all new City employees as a cost-saving measure.

On July 14, 1992, Mr. Carlton issued a letter to the Commission detailing the City's downsized organizational structure for fiscal year 1992/1993, in light of the extensive budget review process. This included reduction, consolidation, elimination, and merger of numerous departments, divisions, and executive/managerial positions within the City. Mr. Carlton stressed that these decisions were based upon the City Commission's directives for downsizing and reducing costs.

On July 22, 1992, Mr. Carlton submitted the proposed budget for fiscal year 1992/1993 to the City Commission.

Upon Mr. Carlton's recommendation, the City entered into negotiations to bifurcate both its wage and pension systems into the recommended two-tier system. Specifically, all City employees hired after the adoption date would be paid on a wage scale that was 15% less than that of all current City employees. Additionally, all City employees hired after the adoption date would have reduced pension benefits so that the maximum amount of their monthly service retirement benefit would be reduced from 4% to 3%. Moreover, the benefit would not exceed 80% of their av-

erage monthly salary, a 10% reduction from that provided to current employees. Additionally, the retirement age was raised City-wide from 50 to 55 with 10 years of service.

Implementation required that the City collectively bargain with the unions representing the employees within the City. On the other hand, the City could implement the bifurcated system without negotiation for employees not represented for purposes of collective bargaining, that is, for the generally unclassified employees and certain other classifications within the classified service. Consequently, on September 16, 1992, the City adopted a two-tier wage plan providing for the 15% reduction in wages for all new hires after October 1, 1992, in general unclassified positions.

Pursuant to a collective bargaining agreement negotiated between the City and the American Federation of State, County, and Municipal Employees (AFSCME), a two-tier wage plan was also adopted. It provided for a 15% reduction in wages for all individuals hired after April 1, 1993, in classifications in the bargaining unit covered by AFSCME.

A similar collective bargaining agreement was negotiated between the City and the International Association of Fire Fighters (IAFF). A two-tier wage plan was adopted with a 15% reduction in wages for all hires after April 1, 1993, in classifications in the bargaining unit covered by the IAFF. That agreement also established a bifurcated pension plan for those employees.

Pursuant to a collective bargaining agreement negotiated between the City and the FOP, a two-tier compensation plan was adopted for all employees in the bargaining unit covered by the FOP and hired after April 15, 1993. Article VIII, Section 3 of the agreement provided:

*Section 3.* All employees hired after the execution of this Agreement shall be paid on a base salary schedule which is 15% lower than the schedule for current employees. This provision will be renegotiated if the City cannot fill its personnel needs or during negotiations for a successor agreement, whichever comes first.

The agreement with the FOP also provided for a bifurcated pension plan for the new hires.

On July 28, 1993, the City adopted a two-tier wage plan for employees in other classifications in the classified service of the City, providing for a 15% reduction in wages for all hires after August 1, 1993. Finally, on February 16, 1994, a two-tier wage plan was adopted providing for a 15% reduction in wages for all hires after February 21, 1994, in classifications in the bargaining unit covered by the Miami Beach Employees Benevolent Association (MBEBA). A two-tier pension system was also adopted in the unclassified plan, as well as in the General Employees Plan.

Tier A refers to the compensation scale for those City employees hired before the cut-off date in their respective bargaining unit or classification. Tier B refers to the reduced compensation scale for those City employees hired subsequent to the cut-off date imposed for their bargaining unit or classification. Eligibility for increases in salary and benefits are determined by performance and length of service with the City, regardless of the tier under which a City employee was hired. All police officers hired by the City after April 5, 1993, were paid pursuant to the Tier B scale, while all police officers hired by the City before April 5, 1993, were paid pursuant to the Tier A scale.

The City eventually modified the two-tier systems City-wide, resulting in collective bargaining agreements covering the period from October 1, 1994, to September 30, 1997, for the bargaining units covered

by the FOP and IAFF. Specifically, three salary grades were added to the Tier B compensation scale so that, upon progressing through the additional grades, Tier B employees would eventually reach the same wage level as those who were on Tier A. The two-tier system was ultimately eliminated, effective October 1, 1997, pursuant to collective bargaining agreements with the FOP and IAFF for employees within those bargaining units.

### B. THE CONSENT DECREE

On June 4, 1993, the City and the U.S. Department of Justice entered into a consent decree to settle a case entitled *United States of America v. City of Miami Beach,* Case No. 91–2926–Civ–Nesbitt (S.D.Fla.)(filed Dec. 23, 1991). In that case, the DOJ alleged that the City engaged in a pattern or practice of employment discrimination by utilizing written examinations that had a discriminatory impact on the entry-level hiring of individuals for the positions of Fire Fighter I and Police Officer/Trainee. Pursuant to Title VII, the complaint alleged discriminatory impact on blacks and Hispanics in the City's fire department, and blacks in the City's police department. The consent decree mandated that the City cease administering its current entry-level police officer written examination or any examination derived therefrom, as well as requiring DOJ or court approval both for any new written examination developed by the City for hiring entry-level police officers, and for the method used to validate the new examination.

The consent decree provided for the priority hiring of individuals who were currently qualified, but who had not been previously hired on account of the alleged unlawful employment policies. This meant that qualified claimants had the right to be offered the first available jobs, up to a total of 10 in each department, in accordance with their respective places on priority hire lists established under the consent decree. The consent decree called for up to 10 individuals—five blacks and five Hispanics—to be hired as priority hires for the classification of Fire Fighter I and up to 10 blacks were to be hired for the classification of Police Officer/Trainee. The City hired five blacks and five Hispanics for Fire Fighter I positions and four blacks for Police Officer/Trainee positions. Anyone hired as a priority hire was given retroactive seniority and benefits to a date of hire based on their original application for employment. This resulted in all priority hires being placed on Tier A of the City's two-tier wage system.

If the City had the need to hire additional police officers or firefighters, the consent decree permitted utilization of interim hiring as a temporary measure, provided the DOJ agreed and the court gave its approval. Interim hiring was defined as "any hiring of entry-level firefighters or police officers that occurs between the entry of the [consent decree] and the date that new selection procedures are held by the court to be lawful." The plaintiffs were all interim hires and were all placed on the Tier B compensation scale. White individuals were also hired as interim hires and placed on the Tier B scale.

### III. THE TIMELINESS OF PLAINTIFFS' CLAIMS [4]

To bring an action under Title VII, a plaintiff must file a timely charge with the EEOC, i.e., within 300 days of the alleged discriminatory conduct. 29 U.S.C. § 626(D)(2). The Eleventh Circuit has

---

4. The City has withdrawn its time-bar argument with regard to the claims under the Florida Civil Rights Act [D.E. 62], in light of the Florida Supreme Court's decision in *Joshua v. City of Gainesville,* 768 So.2d 432 (Fla. 2000).

held that failure to file charges with the EEOC within the applicable time period bars the claims contained in the untimely charge. *See Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 662 (11th Cir.1993). The City contends that the plaintiffs' claims are time-barred under Title VII because the charges of discrimination were filed with the EEOC on February 12, 1997, outside the applicable limitations period. *See* Motion for Summary Judgment at 5, 6 [D.E. 57].

■ The plaintiffs first argue that the City has waived any argument based on timeliness, characterizing this as a jurisdictional issue that must be raised prior to an answer being filed. *See* Response to Motion for Summary Judgment at 11 [D.E. 64]. As the City did not raise timeliness in its motion to dismiss, the plaintiffs argue, they cannot now assert it. *See id.* The law is well-settled that "a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *See Zipes v. Trans World Airlines*, 455 U.S. 385, 386, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Accordingly, the City may raise the statute of limitations as an affirmative defense, and indeed, has done so in its answer. *See* Answer at ¶¶ 10, 58, 59 [D.E. 38].

The plaintiffs' claims are based on the disparity in pay and benefits for Tier B employees as compared to the pay and benefits of Tier A employees. Mr. Prieto and Mr. Olivera were hired as police officers by the City on June 28, 1993, and Ms. Wolfe was hired as a police officer on May 16, 1994. The plaintiffs filed charges of discrimination with the EEOC and the Florida Commission on Human Rights on February 12, 1997. Thus, barring any exceptions, the plaintiffs' claims would be barred as untimely, having been made more than 300 days after their hir-

ing dates. The plaintiffs argue, however, that their claims fall under the continuing violation exception, because the alleged violations of Title VII are ongoing and continuous. *See* Response to Motion for Summary Judgment at 12, 13. The plaintiffs contend that they were subject to discrimination through March 31, 1998, when the consent decree terminated, and thus, they are not barred by any statute of limitations defense. *See id.* at 12.

■ I believe the City has the better of the argument, and conclude that the plaintiffs' claims are time-barred. The plaintiffs' contention is that the two-tier wage system—as applied to them as interim hires under the consent decree—violated Title VII. If the two-tier system violated Title VII, such a violation was known to the plaintiffs at the time of their hire, and the continuing violation theory is inapplicable. As explained by the Eleventh Circuit in *Knight v. Columbus, Ga.*, 19 F.3d 579, 585 (11th Cir.1994): "When, as here, a claim of discrimination . . . is premised on a discrete act, such as a one-time wage reduction, the statute of limitations begins to run from the date of the act. The receipt of subsequent paychecks, albeit diminished on account of the prior unlawful act, does not start a new limitations period." Although *Knight* was a case under the Fair Labor Standards Act, its continuing violation analysis is applicable in the Title VII setting, *see id.* at 581 n. 1, and I find that it is controlling.

The plaintiffs rely on *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 449 (11th Cir.1993), which holds that "race-based, discriminatory wage payments constitute a continuing violation of Title VII." Although this language lends superficial support for the plaintiffs' position, closer examination persuades me that *Calloway* is distinguishable. Unlike the black plaintiff in *Calloway*, who was paid a lower

salary than a white employee, the plaintiffs here were not paid less than similarly situated non-minorities. Instead, the plaintiffs, like all other interim hires, were paid under Tier B regardless of their race or national origin. Because the City's two-tier wage system was applied across the board, the application of this system to the plaintiffs on their dates of hire became the triggering act for statute of limitation purposes under *Knight*. I find, as a matter of fact, that there was no continuing violation. *See Calloway*, 986 F.2d at 448 ("whether a discriminatory act constitutes a continuing violation of Title VII or a past violation with present effect is a finding of fact").

Assuming that the plaintiffs' Title VII claims fall under the continuing violation doctrine, and are therefore timely, the City is nevertheless entitled to summary judgment on the merits of these claims and the FCRA claims.

## IV. THE DISPARATE TREATMENT AND IMPACT CLAIMS

The plaintiffs allege that the City–FOP collective bargaining agreement executed on June 10, 1993, six days after entry of the consent decree, perpetuates disparate treatment for minority officers and has a disparate impact on them by paying reduced wages to those hired after June 10, 1993. Specifically, the plaintiffs allege that because of the City's history of discrimination, and the negotiations involved in the consent decree, the City had knowledge that its interim hires would be predominantly Hispanic and black.[5] In other words, according to the plaintiffs, the City implemented its two-tier wage system knowing that the majority of the Tier B police officers would be members of a class

protected by Title VII, and despite this knowledge, and without a bona fide business reason for doing so, intentionally deprived the Tier B officers of equal employment opportunities. *See* Complaint at ¶¶ 34–37 [D.E. 1] (August 17, 1998).

### A. DISPARATE TREATMENT

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating on the basis of an individual's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2(a). Title VII further provides that it shall be an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.*

 The presentation of proof required to establish a Title VII disparate treatment claim was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination. *See Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994). A plaintiff may establish a prima facie case of discrimination by demonstrating: (1) that he or she is qualified; (2) that he or she suffered an adverse employment action; (3) that the employer treated similarly situated non-minority employees more

---

**5.** Though the plaintiffs allege that the City has a history of discrimination, the consent decree states that it "shall not constitute an admission, adjudication or finding on the merits of the allegations made in the complaint and [the City] expressly denies that it has, or is presently, engaged in a pattern or practice of discrimination against Blacks and Hispanics in violation of Title VII as alleged by the United States." Consent Decree at 2 [D.E. 67, Exh. O].

favorably; and (4) that he or she was qualified for the same level of pay as similarly situated employees. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

### 1. THE PRIMA FACIE CASE

■ The plaintiffs, in their response to the summary judgment motion, seem to concede that they have no direct evidence of discriminatory intent by the City. *See* Response to Motion for Summary Judgment at 14. The plaintiffs must therefore be able to meet a threshold burden—that the circumstantial evidence presented is sufficient to create an inference of discrimination. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997). The evidence in this record, taken in the light most favorable to the plaintiffs, does not suffice.

The plaintiffs characterize Judge Seitz' order of June 28, 1999, in which the City's motion to dismiss was denied, as "endorsing the [plaintiffs'] prima facie case of intentional discrimination." *See* Response to Motion for Summary Judgment at 14. Judge Seitz' order, however, was not an endorsement of the plaintiffs' prima facie case, but a ruling that, based on the four corners of the complaint, and based on the standard for a motion to dismiss, the plaintiffs' burden of pleading had been met. The plaintiffs' burden in resisting a summary judgment motion under Rule 56 is different than the one in opposing a motion to dismiss under Rule 12(b)(6). Indeed, Judge Seitz suggested in her order that "the defendants' arguments are better addressed at the summary judgment stage after the parties have taken discovery on the issue of discriminatory intent." That is because the plaintiffs must, at the summary judgment stage, offer evidence of a prima facie case. No such evidence is required to survive a motion to dismiss.

Based on this record, no reasonable trier of fact could find that the plaintiffs have met their burden of presenting a prima facie case. Although the plaintiffs are presumably qualified for their jobs, and may have suffered an adverse employment action by being paid lower wages, they have not presented evidence that the City treated similarly situated non-minority employees more favorably. The plaintiffs were hired, along with non-minority employees, after April 5, 1993, at which time they became subject to a Tier B pay schedule. Yet other non-minority officers, hired after April 5, 1993, were also subject to a Tier B pay schedule. Specifically, A.J. Prieto's affidavit includes a list of officers hired from April of 1993 until September of 1999 ("two-tier hires") showing that out of 115 officers hired in that period, two were Asian, 18 were black, 60 were Hispanic, and 35 were white. All were hired at a lower wage schedule than those hired before April 5, 1993.

### 2. THE BONA-FIDE SENIORITY SYSTEM

■ The plaintiffs argue that they are, in fact, similarly situated to the officers hired before April 5, 1993, and paid pursuant to a Tier A wage schedule. But a two-tier wage system, if created without an intent to discriminate, is not unlawful under Title VII. *See* 42 U.S.C. § 2000e–2(h) ("Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation...to a bona-fide seniority..system...provided that such differences are not the result of an intention to discriminate."). In other words, the plaintiffs cannot show that they were equally qualified for Tier A wages, and therefore similarly situated to those hired before April 5, 1993, if they were hired under a bona-fide seniority system. *See Teamsters v. United States*, 431 U.S. 324, 352, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("the routine appli-

cation of a bona-find seniority system would not be unlawful under Title VII").

■ The parties agree that *Williams v. Mead Coated Bd., Inc.*, 836 F.Supp. 1552, 1568 (M.D.Ala.1993), *aff'd*, 41 F.3d 668 (11th Cir.1994), correctly sets forth the standard for determining whether a seniority system is a bona-fide one under Title VII. Those factors include whether (1) the seniority system operates to discourage all employees from transferring between seniority units; (2) the seniority units are in the same or separate bargaining units and, if in separate bargaining units, whether the structure was rational and in conformance with industry practice; (3) the seniority system had its genesis in racial discrimination; and (4) the system was negotiated and has been maintained free from any illegal purpose. *See Williams*, 836 F.Supp. at 1568.

The plaintiffs assert that the City's two-tier wage system was not a "bona-fide" seniority system because there was discriminatory intent behind its creation. I can find nothing in the record, however, to support this claim and create an issue of material fact.

The City's seniority system was facially neutral and applied equally to all employees hired after April 4, 1993, regardless of their race or national origin. Moreover, the labor representative of the police officers, the FOP, negotiated and ultimately agreed to the two-tiered system. The FOP was not alone, for the two-tier system was agreed to by other collective bargaining representatives such as the AFSCME and the IAFF, and it was applied to all new hires City-wide. The record, moreover, contains the reports of the citizens' committees that recommended such cost-cutting measures, and there is nothing in those reports, or in any testimony or other documentation that suggests an inference of discriminatory intent. Thus, the plain-

tiffs have not established a prima facie case of intentional discrimination.

### 3. THE CITY'S LEGITIMATE NON-DISCRIMINATORY REASON FOR A TWO-TIER SYSTEM

■ Even if I assume that the plaintiffs have established a prima facie case, the City is still entitled to summary judgment. Once a prima facie case of discrimination has been established, a presumption of discriminatory intent on the part of the employer arises. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). An employer may, however, rebut the inference of discriminatory intent by "clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason" for the adverse employment action. *See Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1073 (11th Cir.1995) (quoting *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir.1985)). The employer's burden at this stage is only one of production and is "exceedingly light." *See Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir.1994). The ultimate burden of persuading the trier of fact that the employer engaged in intentional discrimination remains with the plaintiff throughout the case. *See Hicks*, 509 U.S. at 507, 113 S.Ct. 2742. Once an employer rebuts the presumption of discrimination, the plaintiffs must come forth with "evidence, including the previously produced evidence establishing a prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997). The plaintiffs can establish pretext by showing either that the legitimate, non-discriminatory reason is not to be believed, or that, in light of all the evidence, discriminatory reasons more

likely motivated the decision than the proffered reasons. *See id.* (citing *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996)).

The plaintiffs have submitted depositions of certain individuals involved in the creation of the two-tiered system, presumably to establish evidence of discriminatory intent. One such individual is Peter Liu, the City's budget director at the time the seniority system was instituted. *See* Deposition of Peter Liu at 6–8 [D.E. 67]. The plaintiffs point to testimony from Mr. Liu that although there was a $2,000,000 deficit projected in the 1992–1993 budget for the City, as the fiscal year ended there was a $3,000,000 surplus. *See id.* at 91, 92.

Though not a model of clarity, the plaintiffs' response to the motion for summary judgment seems to suggest that Mr. Liu ignored information, though informed by Larry Jessup, an economist hired by the FOP to analyze the City's books and records, that there would be a surplus of $3,000,000 rather than a deficit. *See* Response to Motion for Summary Judgment at 16. The plaintiffs apparently are arguing that the City purposely negotiated the two-tier system without a legitimate business reason for doing so. It is important, however, to note the rest of Mr. Liu's testimony. Mr. Lui testified that he did not believe that *there ever would have been a surplus but for the cost-saving measures instituted during the City-wide negotiations for the two-tier wage system. See* Liu Deposition at 97. Although Mr. Liu did not suggest that the surplus was based on the wage system for police officers alone, he declared that, in his opinion, if one of the bargaining units had not agreed to the two-tiered system, then another would not have agreed, and "the one that agreed would go back and say that we didn't treat them fairly." *See id.*

The plaintiffs also attempt to utilize the consent decree entered into by the DOJ and the City to bolster their argument that the City had a discriminatory intent in implementing the two-tier system. The plaintiffs contend that due to the City's discriminatory history and the requirements of the consent decree, the City knew that most of the new hires paid under the Tier B scale would be minorities. Yet the record does not support this inference. First, the consent decree includes an express denial by the City that it had engaged in discrimination against blacks and Hispanics as alleged in that case by the United States. *See* Consent Decree at 2. Second, the decree required the elimination of an entrance exam given to new police officers and firefighters, and required the City to "priority hire" up to 10 otherwise-qualified black individuals who had already applied for police officer positions but had been rejected based on the entrance exam. *See id.* Other than those officers, nothing in the consent decree required the hiring of minorities for future positions. *See id.* at ¶ 6 ("Except for the provisions concerning individual relief in this Decree, nothing in this Decree either requires or permits the defendant to grant a preference based on race or national origin in hiring."). Third, all of the priority hires were compensated under the Tier A schedule.

Finally, the two-tier wage system was instituted City-wide, not just at the police department. As noted earlier, the record includes the citizens' committee reports used by the City commission in making the decision to implement the two-tier wage system, as well as a recommendation memorandum from Mr. Carlton, the City Manager at the time the decisions were made, to the Mayor and the City Commission. *See* City of Miami Beach Pension Systems Review Committee Report and Recommendations, January 10, 1992 (Exh. 2); City of Miami Beach Fiscal Health Analysis and Financial Responsibility Program

as of September 30, 1991 (Green Report) (Exh. 3); Roger Carlton Memo to Mayor Seymour Gelber and the City Commission, July 14, 1992 (Exh. A) [D.E. 59]. These reports clearly identify the City's poor fiscal health as a major concern, and the desire to control and contain the growing personnel budgets by adjusting the newly hired City employees' income and benefits—along with other cost-cutting and control measures—was the City's legitimate non-discriminatory reason for instituting the two-tiered wage system.

On this record, I find, as a matter of law, that the City's two-tier wage and pension system was a bona-fide seniority system under § 2000e–2(h). The plaintiffs were not similarly situated to those employees paid on the Tier A scale and hired before April 5, 1993. The plaintiffs were similarly situated to all those employees hired after April 5, 1993, but because that group of employees included both non-minorities and minorities, the plaintiffs cannot show that they were treated differently from non-minority police officers hired after April 5, 1993. No reasonable trier of fact could find that the City had the requisite discriminatory intent required for a disparate treatment claim under either Title VII or the FCRA. *Cf. Sanchez v. City of Santa Ana,* 928 F.Supp. 1494, 1503–1505 (C.D.Cal.1995) (rejecting claim of Hispanic police officers that City's merit pay policy and seniority point bonuses, used in making promotions, was not a bona fide seniority system). Summary judgment is therefore granted in favor of the City on the disparate treatment claims (Counts I and III).

**B. DISPARATE IMPACT**

■ Disparate impact claims prohibit employment practices which, though facially neutral, have a disproportionate impact on a group protected by Title VII. *See EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1274 (11th Cir.2000). Although disparate treatment claims require a showing of discriminatory intent, generally disparate impact claims do not. *See id.* In a disparate impact action, "the plaintiff must, in order to make out a prima facie case, show that the facially neutral employment practice has had a significantly discriminatory impact." *See id.* (quoting *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982)).

■ As noted earlier, Title VII specifically provides that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona-fide seniority system... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(h). Courts have consistently interpreted this provision to permit bona-fide, facially neutral seniority systems, even if they result in an adverse impact on minorities. *See Williams,* 836 F.Supp. at 1567. Thus, where a bona-fide seniority system is in effect, even statistical evidence of a disparate impact on minorities will not be sufficient to show a violation of Title VII, unless there is evidence of discriminatory purpose. *See Trans World Airlines v. Hardison,* 432 U.S. 63, 82, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) ("absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences"); *Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527, 542 (5th Cir.1980) ("purposeful discrimination in connection with the establishment or continuation of a seniority system is integral to a determination that the system is or is not bona fide"); *See also Dodd v. Runyon,* 114 F.3d 726, 730 (8th Cir.1997) ("The effect of [§ 2000e–2(h) ] is

that a plaintiff challenging an employment practice based upon a bona fide seniority system must prove discriminatory intent; proof of a disparate impact is insufficient."); *Williams*, 836 F.Supp. at 1567 ("[under § 2000e–2(h)] a showing of disparate impact is insufficient to invalidate a seniority system, even though the result may be to perpetuate pre-Act discrimination").

The City's seniority system was, for the reasons discussed above, a bona-fide one. It was facially neutral and applied equally to all races and groups. The evidence shows that the same rules applied to white, Asian, Hispanic, and black employees hired after April 5, 1993. The evidence also shows that the system was negotiated in a collective bargaining agreement with the FOP, the representative for all the City's police officers. The structure of the agreement was rational, given the data considered by the City, which showed a need for cost-cutting measures. Though the plaintiffs have not offered much statistical evidence to show disparate impact, even a strong showing of disparate impact would not prove an unlawful employment practice in violation of Title VII. Accordingly, summary judgment is granted for the City on the disparate impact claims (Counts II and IV).

### IV. CONCLUSION

Based on this record, and taking the facts in the light most favorable to the plaintiffs, no reasonable trier of fact could find that there was discriminatory intent on the part of the City in developing and implementing the two-tier wage system. Accordingly, summary judgment is granted in favor of the City on Counts I, II, III, and IV. A final judgment will issue by separate order.